<u>NOT FOR PUBLICATION</u>

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____

SHAWN LENAHAN and JOSEPH          :
KAPCSOS, et al.,                  :
                                  :          **Hon. Stanley R. Chesler, U.S.D.J.**
            Plaintiffs,           :          **Civ. No. 02-0045**
                                  :
        v.                        :
                                  :          **OPINION**
SEARS, ROEBUCK and Co.,           :
                                  :
            Defendants.           :
                                  :
_____:


### CHESLER, U.S. District Court Judge

**THIS MATTER** comes before the Court upon the motion of Plaintiffs, Shawn Lenahan,

Joseph Kapcsos, Carlos DeSoto and Mike Banta, individually and on behalf of the classes they

represent and on behalf of all In-Home Service Technicians similarly situated (collectively

"Plaintiffs") for an Order Certifying the Settlement Classes, Granting Incentive Awards to the

named Plaintiffs, and Granting Final Approval of the Stipulation and Settlement Agreement

entered into between Plaintiffs and Sears.  For the reasons set forth below, this Court will

**GRANT** Plaintiffs' Motions.

### I.   GENERAL BACKGROUND

Sears is a retailer of apparel, home and automotive products and services.  In addition,

Sears operates a Product Repair Services Division ("PRS") which is responsible for the service

and repair of its appliances such as lawnmowers, dishwashers and air conditioners.  Within the

1

PRS Division, is an In-Home Service Group which is responsible for product repair in customers' homes.  In November, 2001, Sears implemented the Home Dispatch Program ("HDP") for service technicians, replacing their former "call first" procedure.  The implementation of the HDP was the motivation for Plaintiffs' filing of the instant lawsuit.

**A.     The "Call First" Procedure**

Under the "call first" procedure, Sears provided service technicians with a Sears-owned van to use for their personal commute to and from work.  If a technician chose to use the Sears van, Sears paid for all expenses associated with the vehicle including gas, maintenance and insurance.

Under the "call first" procedure technicians would report to their respective units in the morning at a scheduled time.  Most technicians commuted from home to the unit in their Sears-owned van; others used their own cars or public transportation.   Technicians were not paid for their commute time to the unit regardless of their method of transportation.  Payable time began once the technicians arrived at their unit and punched in on their Hand Held Terminals ("HHT").

At their unit, technicians would call customers on his/her schedule and set expected arrival times for each service call.  In addition, when necessary, the technician would restock his van with parts, dispose of garbage and hazardous waste, submit cash payments received from the prior day's customers, and exchange uniforms.  From there, the technician would depart to his first call, typically arriving between 9:30 a.m. - 10:00 a.m.  At the end of the day, the technician drove directly home from his/her last call and would "punch out" on the HHT[1].

---

[1]During March and April of 2003, the HHT was replaced with a new laptop computer called the SST.

B.      **The Home Dispatch Program**

The "call first" program was discontinued on November 14, 2001 when Sears initiated its

Home Dispatch Program ("HDP").  The HDP allowed technicians to go directly from their homes

to their first call of the day.  Those who participated in the HDP would continue to use Sears' van

for commuting purposes, but would now commute directly from their homes to the first customer

in the morning, and directly home from the last customer in the evening.  Those who chose not to

participate in the HDP would commute to and from their home to their assigned unit, or another

location where the van was kept.  The policies and instructions for the HDP were set out in an In-

Home Technician Process Manual[2] ("Manual").  (Sears Ex. A.)  This Manual and its provisions

apply to all technicians nationwide.  (Sears Ex. B.)

Technicians participating in the HDP received their daily customer call assignments on

their SSTs.  These assignments were transmitted overnight electronically from Sears' mainframe

computer to the technicians' SSTs at their homes.  In the morning, technicians would log onto

their SST to view the location of their first service call for the day.  The process of logging onto

the SST and viewing customer call assignments has been measured by Sears to take between 40

and 79 seconds depending on the model of SST and the type of connection to Sears' mainframe.

If an overnight transmission of assignments is not completed, the technician must perform

a "manual upload/download" to receive the assignments.  This process has been measured to take

approximately 22 seconds.  If the manual upload/download is not successful, the technician must

trouble shoot the problem and/or call the Sears SST help desk, or a manager for assistance in

receiving the day's assignments.  Sears instructs technicians that if this happens, and the

---

[2]The Manual is now called the In-Home SST Technician Manual.

technician is required to spend some time trouble shooting and seeking help, the technician is to fill out and submit a payroll correction form to be compensated for this time.  (Sears Ex. A § 2.2.)

Once the technician has received the day's assignments, he is instructed to turn off the SST and place it in its power cradle in the Sears' owned van.  Technicians then use the van to drive from their home to the first customer of the day, and to continue throughout the day on their customer call routes.  They record call details and communicate with managers on their SSTs.  At the end of the day, technicians participating in the HDP prepare the necessary paperwork, drive home in the Sears van, remove the SST from the van, and plug it into electrical and telephone outlets in their home to receive the overnight transmission of the next day's assignments.

Commuting time for participating technicians is unpaid, both at the beginning and end of the day, unless it exceeds "normal commute time" which was set at 35 minutes for all districts. Customer service calls were now scheduled by customer care network associates rather than the technicians themselves, and replacements for truck stock parts were shipped to the technician's home.  Under the HDP, technicians are compensated for all morning and evening commute time in excess of 35 minutes, as well as all time spent repairing appliances, traveling between customer calls and performing other work-related activities during the work day.

**C.**     **Plaintiffs' Claims**

Plaintiffs Shawn Lenahan and Joseph Kapcsos, former and current Sears technicians respetively, brought this purported class action alleging that Sears' HDP violates the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, et seq. and the Wage and Hour Law of the State of New Jersey, N.J.S.A., 34:11-56A et seq.  The settlement before this Court has its genesis in three additional pending class action lawsuits brought by Sears' technicians: (1) Desoto, et al. v. Sears,

Roebuck and Co., No. RG03-096692 (Alameda County, California Superior Court); (2) Caiarelli,
et al. v. Sears Roebuck and Co., No. GD 03-001735 (Court of Common Pleas for Allegheny
County, Pennsylvania); and (3) Winter, et al. v. Sears Roebuck and Co., No. 05-2-33313-8MCH
(Superior Court of King County, Washington).  Each case asserts essentially the same claims,
namely that the HDP violates federal and/or state wage and hours laws by:  (1) failing to
compensate technicians for the morning and evening commute; (2) requiring or permitting the
technicians to perform uncompensated "off the clock" work and (3) failing to pay for all work
performed in excess of forty hours in a work week at the applicable overtime rate.

**D.      Procedural History**

The Complaint in this matter was filed on January 2, 2002.  After approximately 18
months of discovery, Plaintiffs filed a motion for partial summary judgment on June 27, 2003.
(Docket Item # 48.)  On the same day, Defendants also filed a motion for summary judgment.
(Docket Item # 50.)

Settlement discussions began in the Fall of 2003.  (Schneider-King Decl. ¶ 40.)  The
parties attended settlement conferences with Magistrate Judge Tonianne Bongiovanni on
September 18, October 10, and November 18, 2003.  (Id. ¶ 41.)  No settlement was reached at
that time.

On or about December 30, 2003 this case was referred to mediation by an Order of
Magistrate Judge Bongiovanni and the case was stayed.  The parties attended mediation sessions
before the Honorable Nicholas H. Politan (ret.) on January 22, 2004 and March 1, 2004.  The
parties notified the Court on March 30, 2004 that, despite good faith efforts, no settlement had
been reached.  On April 13, 2004, Magistrate Judge Bongiovanni issued a Stipulation and Order

reinstating the pending motions.  (Docket Item # 72.)  On May 13 and May 24, 2004, the parties in *Lenahan* attended settlement conferences with this Court, and again, were unable to reach a settlement. (Schneider-King Decl.  ¶ 44.)

On September 17, 2004, Plaintiffs filed a motion for equitable tolling of the statute of limitations.  (Docket Item # 74.)   On January 13, 2005, the parties in both the *Lenahan* and *DeSoto* actions attended another mediation session with the Honorable Nicholas Politan in an attempt to find a nationwide resolution of all wage and hour claims against Sears.  (Schneider-King Decl.  ¶ 46.)  Over the course of the next several months the parties engaged in significant negotiations via telephonic conferences and additional conversations with Judge Politan.  (Id.  ¶ 53.)   On May 16, 2005, during a telephonic status conference, the parties informed the Court that they had reached a tentative settlement.  That same day, the Court issued an Order withdrawing all of the parties' pending motions.  (Docket Item # 87.)

On or about October 19, 2005, the parties submitted a joint motion for preliminary approval of their settlement and a joint motion to certify the class.  (Docket Item # 92.)  On November 2, 2005, the *Winters* and *Caiarelli* plaintiffs filed a motion to intervene for the purpose of opposing the proposed class settlement, and to continue the preliminary approval hearing. (Docket Items # 95, 97.)

**E.      Preliminary Approval of the Settlement**

The *Lenahan* and *DeSoto* Plaintiffs and Sears negotiated a Stipulation and Settlement Agreement ("Settlement"), individually and on behalf of the classes they represent and on behalf of all others similarly situated, which settles and compromises all claims asserted with respect to the operation of the HDP.  The settlement includes all claims in the *Lenahan, DeSoto, Caiarelli*

and *Winter* lawsuits, and all claims nationwide arising from or related to these suits.  (Stipulation

and Settlement Agreement, Sears Ex. C.)

      This Court held a preliminary approval hearing on November 10, 2005, at which time the

Court granted preliminary approval to the parties' nationwide settlement.[3]  The Court also

provisionally certified three classes for settlement purposes:

    •    Class One (State Law Class for California, New Jersey, Pennsylvania and Washington
        State Law Claims): All persons who were, are or will be employed by Sears and have
        or will have participated in the HDP as technicians in the States of New Jersey,
        California, Pennsylvania and Washington ("Class One") during the period from the
        commencement of the HDP through the date of the Preliminary Approval Order.

    •    Class Two (State Law Class for Other State Law Claims): All persons who were, are
        or will be employed by Sears and have or will have participated in the HDP as
        technicians in the following states ("Class Two"), during the period from the
        commencement of the HDP through the date of the Preliminary Approval Order:
        Alaska, Arkansas, Colorado, Connecticut, Delaware, District of Columbia, Hawaii,
        Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Maine, Maryland, Massachusetts,
        Michigan, Minnesota, Montana, Nebraska, Nevada, New Hampshire, New Mexico,
        New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Rhode Island,
        South Dakota, Vermont, Virginia, West Virginia, Wisconsin and Wyoming.

    •    Class Three (FLSA claims): All persons who are not members of Class One or Class
        Two and who were, are or who will be employed by Sears and have or will have
        participated in the HDP as technicians during the period November 10, 2002 through
        November 10, 2005 or whose employment terminated but who filed a consent to join
        in *Lenahan et al. v. Sears, Roebuck and Co*.

Additionally, the Court appointed the *Lenahan* and *DeSoto* Plaintiffs as Class Representatives and

the *Lenahan* and *DeSoto* Plaintiffs' attorneys as Class Counsel.  Class Representatives were

granted leave to, and have subsequently filed, an Amended Class and Collective Action

_____

     [3]The Court preliminarily approved the settlement by an Order dated November 10, 2005.
Subsequently, the Court issued a Consent Order amending the preliminary approval dated
December 22, 2005.  (Docket Item # 110.)

Complaint in *Lenahan* asserting both federal and state wage and hour claims on behalf of a nationwide class of Sears' technicians.

The Amended Complaint encompasses all claims by the *Lenahan*, *DeSoto*, *Caiarelli*, and *Winters* lawsuits and seeks certification of Settlement Classes of present and former Sears technicians nationwide asserting (a) claims under the FLSA as a "collective action" pursuant to 29 U.S.C. § 216(b) and (b) claims under the applicable wage and hour laws of the various states pursuant to this Court's supplemental jurisdiction under 28 U.S.C. § 1367(a).

**F.      The Proposed Settlement**

Under the Proposed Settlement, Sears is required to pay fifteen million dollars ("Gross Settlement Amount"). (Sears Ex. C at 8.) Class counsel will seek no more than thirty percent of the Gross Settlement Amount for attorneys fees plus costs incurred in connection with the instant litigation. The costs and fees will include all attorneys' fees and costs incurred by counsel for the *Caiarelli* and *Winter* Plaintiffs. (Id.) An incentive award of $2,500.00 will be paid to each of the four named Plaintiffs in the *Lenahan* and *DeSoto* actions, as well as all named Plaintiffs in the *Caiarelli* and *Winter* actions, except those who opted out of the settlement.

The Net Settlement Amount will be distributed to Settlement Class members based upon their number of compensable workweeks as calculated by the Settlement Administrator. Each week for class members in Class One will be weighted at 1.5 compensable work week under the formula. Work weeks for members of Class Two and Three will be weighted at 1.0 compensable workweek.

After calculation of individual class member workweeks, the total number of compensable workweeks will be calculated by adding together the individual class member workweeks ("Total

Class Members Workweeks"). The dollars payable for compensable workweeks will be calculated by dividing the Total Class Members Workweeks into the Net Settlement Amount. Dollars payable for compensable workweeks will then be multiplied by the number of individual class member workweeks worked by each settlement class member (the "Claim Share").

Additionally, Sears will distribute to all incumbent technicians an election form on which each technician will choose whether or not he or she agrees to participate in the HDP on the terms and conditions specified on the form. Sears will also notify all technicians in writing that: (1) the only activities technicians are to perform under the HDP prior to starting their route and compensable workday, are to log onto the SST and determine the location of the first customer call of the day, place unopened boxes of truck stock replenishment parts in the van, as necessary, and to place the SST in the service van and commute to the first customer of the day; (2) the only activities technicians are to perform under the HDP after ending their route and compensable workday are to commute home, remove the SST from the service van and plug it into the telephone and power lines at home, and replenish unopened service parts if it is more convenient to do so at night; and (3) technicians are to submit solar time keeping correction forms to be compensated for time spent prior to starting their route or after ending their route in the performance of other activities directed by Sears under the HDP. (Sears' Ex. C., 16.)

**G.     Notice to Class Members**

On January 13, 2006, the court-approved Settlement Administrator mailed notice to the 16, 252 members of the settlement class, based upon a list provided by Sears. The notice informed Class members of the terms of the Settlement, the plan of distribution of the settlement proceeds and that Plaintiffs' counsel would apply for an award of attorneys' fees of up to 30% of

the Settlement Fund along with reimbursement of costs and expenses.  The notice provided that any opt outs, objections, or claims had to be filed by March 16, 2006.

As of April 6, 2006, the Settlement Administrator had received 190 opt-outs and six objections to the settlement.  On March 22, 2006, a brief stating objections to the Proposed Settlement was filed with the Court by four objectors, Dean Winter, Vern Sailand, Tehron Harmison and Bernaldo Mora, four of the *Winter* plaintiffs ("*Winter* objectors").  One member of the *Cairelli* class[4] submitted objections to the Proposed Settlement ("Pennsylvania objector").  The Court also received an objection to the Proposed Settlement from James S. Reist, a current Sears Technician from Wisconsin.  As of April 6, 2006, the Settlement Administrator had received 7,576 claim forms.

*Winter* objectors argue that Class notice was misleading and failed to satisfy due process. (Winter Br. 26.)  The notice described all four pending class actions and then stated that, "Plaintiffs and Sears engaged in settlement discussions . . . [and have] reached an agreement to settle the claims raised by Plaintiffs for a settlement fund of $15 million. . . ." (Dale Cert., Ex. 1.) The *Winter* objectors contend that because the terms "Plaintiffs" and "parties" are never defined, the notice implies that these terms include plaintiffs and parties from all four lawsuits.

Objectors also contend that the subsequent paragraph referencing opinions of "Class counsel" on the strengths and weaknesses of the case is likewise misleading.  (Winter Br. 26.) Objectors contend that a class member from Washington of Pennsylvania may misinterpret the notice as stating that counsel for all four actions endorse the settlement.

---

[4]The Brief containing objections to the Proposed Settlement was filed by a Sears technician in Pennsylvania who would otherwise be a member of the class sought to be certified in the *Caiarelli* case.

To satisfy due process, notice must be "reasonably calculated under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." In re Cendant Corp. Sec. Litig., 109 F. Supp. 2d. 235, 254 (D.N.J. 2000). This standard is met if the notice informs class members concerning: (1) the nature of the litigation; (2) the general terms of the settlement; (3) where complete information can be located; and (4) the time and place of the fairness hearing and that objectors may be heard. Id. Here, the Class notice complied with each of these requirements. (Dale Cert., Ex. 1.)

The Class notice adequately informs class members of the claims encompassed by the Proposed Settlement and lists all four pending actions which are included. Likewise, the notice provides class members with information about the settlement, the rights and benefits of the respective classes, where to obtain more information, and details on the final fairness hearing. (Id.) Objectors' contention that notice was misleading does not convince this Court that the Class notice violated due process. In fact, the introduction paragraph of the Class notice specifically states that "[a] settlement has been reached between plaintiffs and Sears, Roebuck and Co. in *Lenahan, et al. v. Sears, Roebuck and Co.*, pending in the United States District Court, District of New Jersey. . . ." (Id.) Although objectors contend that later, the notice is unclear regarding who, in fact, negotiated the settlement, the Court finds the introductory paragraph clear and the Class notice to be adequate.

## II.   DISCUSSION

### A.    Class Certification

This Court preliminarily certified this Class for settlement purposes in the Preliminary Approval Order. Rule 23 of the Federal Rules of Civil Procedure allows this Court to certify a

11

class for settlement purposes only.  In re The Prudential Insurance Co. of America Sales Practices Litig. ("Prudential I"), 962 F. Supp. 450, 508 (D.N.J. 1997).  A settlement class is "a device whereby the court postpones the formal certification procedure until the parties have successfully negotiated a settlement, thus allowing a defendant to explore settlement without conceding any of its arguments against certification."  In re General Motors Corp. Pick-Up Truck Fuel Tank Products Liability Litig., 55 F.3d 768, 786 (3d Cir. 1995) ("General Motors").   When certifying a settlement class, courts must follow the general requirements of Rule 23 and, therefore, "a settlement class must satisfy the Rule 23(a) requirements of numerosity, commonality, typicality, and adequacy of representation and the Rule 23(b) requirements."  Prudential I, 962 F. Supp. at 508.  Additionally, where, as here, a settlement class is sought to be certified under Rule 23(b)(3), the class must satisfy the Rule's superiority and predominance requirements.

This Court provisionally certified three classes for settlement purposes in its Preliminary Approval Order.  This Court must find that Classes One and Two[5] meet the requirements of Rule 23(a) and (b) and that class certification remains appropriate.

1.    **Rule 23 Class Certification Requirements Are Satisfied**[6]

*i.    Numerosity*

Rule 23(a)(1) provides that a class action may be maintained only if "the class is so

---

[5]Class Three raises only FLSA claims and has been conditionally certified as a collective action pursuant to 29 U.S.C. § 216(b).  In the Preliminary Approval Order, this Court determined that all technicians were "similarly situated," with respect to the nationwide implementation of Sears' HDP, within the meaning of § 216(b).  No objection has been filed for decertification or challenging that finding.

[6]The Court received no objections to the requirements of Rule 23 as to numerosity, commonality, typicality, adequacy of representation, predominance or superiority.

numerous that joinder of all members is impracticable." The numerosity requirement of Rule 23(b)(1) does not require joinder to be impossible. "To meet the numerosity requirement, class representatives must demonstrate only that 'common sense' suggests that it would be difficult or inconvenient to join all class members." Prudential I, 962 F. Supp. at 510 (citing Lerch v. Citizens First Bancorp, Inc., 144 F.R.D. 247, 250 (D.N.J. 1992)).

When dealing with a class that numbers in the hundreds, joinder will most often be impracticable. See Newberg on Class Actions (4th Ed. 2002) § 305 (class of 40 or more raises presumption that numerosity requirement met). Here, the proposed classes each contain more than 4,000 members who were employed by Sears during the appropriate liability period. Rule 23(a)(1) is therefore satisfied.

>                   ii.      *Commonality and Predominance*

Rule 23(a)(2) requires there be "questions of law or fact common to the class." Rule 23(b)(3) requires that these common issues of law or fact "predominate over any questions affecting only individual members." The predominance requirement of Rule 23(b)(3) is a more exacting standard and, therefore, incorporates the Rule 23(a) commonality analysis. See In re Warfarin Sodium Antitrust Litig., 391 F.3d 516, 528 (3d. Cir. 2004). Accordingly, the two factors are commonly considered together. See Id; see also In re LifeUSA Holding, Inc., 242 F.3d 136, 144 (3d. Cir. 2001); Prudential I, 962 F. Supp. at 510.

The commonality requirement of Rule 23(a)(2) is satisfied if there is at least one question of fact or law common to the class. See In re Baby Neal, 43 F.3d 48, 56 (3d Cir. 1994). Here, the commonality requirement is met because the federal and state claims asserted with respect to Sears' nationwide HDP present common operative facts and common questions of law, namely:

(1) whether Sears failed to compensate technicians for time spent in their morning and evening commutes to the first customer of the day and back home from the last customer of the day, respectively, for which they should have been paid; and (2) whether Sears required technicians to perform uncompensated incidental activities at home and elsewhere for which they should have been paid.  (Am. Class Action Compl. ¶¶ 25-34.)

For the class to be certified under Rule 23(b)(3), which the parties are seeking here, this Court must also find that these common questions predominate over individual issues.  "To evaluate predominance, the Court must determine whether the efficiencies gained by class resolution of the common issues are outweighed by individual issues presented for adjudication."  Prudential I, 962 F. Supp. at 510-11.  At the core of this settlement is the nature of Sears' HDP and what it specifically requires of individual Sears Technicians.  Each class member shares a similar legal question: whether the alleged failure to pay for all hours worked by Technicians under the HDP violated the applicable state wage and hour laws.  The common questions shared by class members predominate over any factual variations regarding individual technicians claims, such as the length of their commute or hourly wage.  These individual issues affect only the technician's potential damages, but not the nature or legal basis of class claims.  See Prudential I, 962 F. Supp. at 517 ("Individual damages issues do not defeat an otherwise valid class certification attempt"); Baby Neal, 43 F.3d at 57 (same).

Similarly, variations between the wage and hour laws of different states are not sufficient to defeat predominance for a settlement class.  See Warfarin, 391 F.3d at 529-30; In re Prudential Insurance Co. America Sales Practice Agent Actions ("Prudential II"), 148 F.3d 283, 313-315 (3d Cir. 1998).  Certification of litigation classes with claims arising under the laws of several states

requires a court to determine whether such state law variations render class action litigation unmanageable.  See In re Sch. Asbestos Litig., 789 F.2d 996, 1010 (3d Cir. 1986).   These concerns of case manageability, however, are not present in the context of a class being certified for settlement purposes only.  See Warfarin, 391 F.3d at 529 ("when dealing with variations in state laws, the same concerns with regards to case manageability that arise with litigation classes are not present with settlement classes"); Amchem Prods. Inc. v. Windsor, 521 U.S. 591, 620 (1997).  Here, the class is not being certified for litigation purposes, thus, as in Prudential, predominance is not defeated by variations in the laws of the fifty states.

      *iii.*    *Typicality*

Rule 23 also requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." FED. R. CIV. PRO. 23(a)(3).  "Typicality lies where there is a strong similarity of legal theories or where the claims fo the class representatives and class members arise from the same alleged course of conduct by the defendant." Prudential I, 962 F. Supp. at 518 (citations omitted.)  Thus, even where there may be factual differences between the claims of the class representatives and other class members, it does not rule out a finding of typicality.  In re Lucent Technologies, Inc., Sec. Litig., 307 F. Supp. 2d 633, 640 (D.N.J. 2004) (citing Prudential II, 148 F.3d at 310).  Here, the same allegedly unlawful conduct affected both the named Plaintiffs and the putative class members, namely Sears' HDP.  Both the named Plaintiffs and the class members have alleged that Sears' failure to compensate Technicians for work at home and travel time violated the applicable state and federal wage and hour laws. Accordingly, this Court finds the typicality requirement of Rule 23(a)(3) is also satisfied.

      *iv.*    *Adequacy of Representation*

Rule 23(a)(4) requires that the "representative parties fairly and adequately represent the interests of the class." F.R.C.P. 23(a)(4). To determine whether a class is adequately represented, courts look to two factors: "(1) the plaintiff's attorney must be qualified, experienced, and generally able to conduct the proposed litigation, and (2) the plaintiff must not have interests antagonistic to those of the class." Prudential I, 962 F. Supp. at 519. Those standards are met here.

Named Plaintiffs and their counsel have prosecuted this action vigorously on behalf of the class. Plaintiffs' counsel are experienced in this area and have prosecuted a number of class action lawsuits in the employment and overtime wage context. (Schneider-King Decl., ¶ 70, 91.) Furthermore, under the proposed settlement, all class members who submit timely claims, including the named Plaintiffs, will receive a pro-rata portion of the settlement fund based on the number of weeks they worked as Technicians during the relevant time frame. As such, there is no conflict of interest in the settlement allocations[7]. Accordingly, the Court is satisfied that the Rule 23(a)(4) requirement of adequate representation is met.

> v. *Superiority*

Rule 23(b)(3) requires that "a class action [be] superior to other available methods for the fair and efficient adjudication of the controversy." The Rule provides the Court with four non-exclusive factors to aid in this determination: (1) the interest of members of the class in individually controlling the litigation of separate claims; (2) the extent to which litigation

_____

[7]In addition, each named Plaintiff will receive a $2,500 incentive award. These awards, however, constitute a small fraction of the total $15,000,000 settlement fund. Additionally, after adequate notice and an opportunity to object, no class members objected to the incentive payments to the named Plaintiffs.

concerning the current controversy had already been commenced by members of the class; (3) the desirability of concentrating claims in a given forum; and (4) difficulties in management of the litigation if pursued as a class action.  FED. R. CIV. PRO. 23(b)(3)(A)-(D).

Here, the Court finds a settlement class action to be the superior method for litigation of these claims.  The size and scope of this class weighs in favor of class certification.  "As the case becomes larger and more geographically dispersed, the traditional alternatives of joinder, consolidation, and intervention will be impracticable."  Prudential I, 962 F. Supp. at 523 (citing 1 Newberg § 4.33, at 4-136 to 4-137).  This settlement class involves Sears Technicians nationwide, and, therefore, traditional methods of joinder and consolidation are impracticable. Additionally, in this case, the amount of recovery that each class member will receive is relatively modest, leaving individual class members with minimal incentive and little ability to litigate their claims against Sears independently.  The alternative to class action litigation is for individual Technicians to bring multiple, individual lawsuits for their small amount of damages.  This alternative would be uneconomical for potential individual plaintiffs as litigation costs could dwarf any potential recovery. Here, a class action would facilitate the spreading of litigation costs among Plaintiffs. See Prudential II, 148 F.3d at 315-16.

In the context of a settlement class action, concerns regarding litigation management and the desirability of concentrating the litigation in a particular forum are insignificant.  See Amchem, 521 U.S. at 620 (stating that when confronted with a settlement-only class certification, a district court need not be concerned with issues of manageability if the case went to trial, because the point of the settlement is that there will be no trial.)  Additionally, the Court finds that New Jersey is the proper forum for this settlement.  The claims of the *Lenahan* Plaintiffs have

17

been vigorously litigated and have advanced through discovery and motion practice.  Considering these factors and the difficulty individual Technicians would suffer if forced to bring these claims individually, the Court finds that "the class action is not only the superior method for adjudicating this controversy, it affords the vast majority of class members the only practical avenue of redress." Prudential I, 962 F. Supp. at 522.  This Court, therefore, finds this class action settlement represents a superior means to resolving the claims in this case.

Thus, this Court grants final class certification to Classes One and Two under Rules 23(a) and (b)(3).  All persons who satisfy the Class definition, except those who properly requested exclusion from the Class in accordance with the Preliminary Approval Order, are members of the Class and are bound by the terms of the Settlement, and the Final Judgment.

**B.    Fair Labor Standards Act ("FLSA") Collective Action Standard**

Class Three raises only FLSA claims and has been conditionally certified as a collective action pursuant to 29 U.S.C. § 216(b).  Section 216(b) of the FLSA, states that  "an action . . . may be maintained [under the FLSA] . . . by any one or more employees for and in behalf of himself or themselves and other employees similarly situated."  29 U.S.C. § 216(b) (1982)

Unlike the class action requirements under Rule 23, § 216(b) requires class members to "opt-in" by affirmatively indicating their consent to be part of the class.  See Sperling v. Hoffman-La Roche, Inc., 862 F.2d 439, 444 (3d Cir. 1988).  Section 216(b) mandates that "[n]o employee shall be a party plaintiff to any such action [under the FLSA] unless he gives consent in writing to become such a party and such consent is filed in the court in which such action is brought."  29 U.S.C. § 216(b).

Under § 216(b), there are two threshold requirements for an action to proceed as a

collective action: (1) class members must be "similarly situated" and (2) all members must affirmatively consent to join the action. Id.  In the Preliminary Approval Order, this Court determined that all Sears Technicians nationwide are "similarly situated" with respect to the nationwide implementation of Sears' HDP.  (Preliminary Approval Order, at 5.)

The FLSA does not define "similarly situated" and neither the Third Circuit nor the Supreme Court have expounded a test for making such a determination.  In the absence of such guidance, district courts have established a two-tier test to determine who are "similarly situated' employees under § 216(b).  See Morisky v. PSE&G Co., 111 F. Supp. 2d 493, 497 (D.N.J. 2000); Moeck v. Gray Supply Corp., 2006 WL 42368, * 4 (D.N.J. 2006); Bayles v. American Med. Response of Colorado, Inc., 950 F. Supp. 1053, 1066-67 (D.Colo. 1997).  The Court first makes a determination during the "notice stage" – the stage when the Court decides whether to provide notice to potential class members.  Morisky, 111 F. Supp. 2d at 497.  The determination at this stage involves a lenient standard and generally results in "conditional certification" of a class.  Id. Such conditional certification requires "nothing more than substantial allegations that the putative class members were together the victims of a single decision, policy or plan."  Sperling, 862 F.2d at 407.

Later, after discovery is largely complete and the case is ready for trial the court will make a second determination.  Morisky, 111 F. Supp. 2d at 497.  At this stage the court will have more information on which to base its decision and, therefore, will employ a stricter standard.  Id.  If, under the more stringent standard, the court determines that plaintiffs are similarly situated, the case will proceed as a collective action.  Id.

The posture of this case has been somewhat different.  At the time this Court conditionally

19

certified the class, the parties had already engaged in significant amounts of discovery and

litigation.  As such, the Court was presented with more than simply "substantial allegations,"

when it determined plaintiffs were similarly situated.  Consents have been received from 630 class

members.  (Schneider-King Decl. ¶ 22.)  Putative class members are all present or former Sears

Technicians asserting claims under Sears' nationwide HDP.  No objection to the Court's

conditional certification of this collective action has been filed challenging the Courts

determination that these class members are similarly situated.  Accordingly, the Court finds that

these 630 plaintiffs remain similarly situated and this action can proceed as a collective action

under § 216(b).

**C.      Fairness of the Class Action Settlement**

        Any settlement of a class action must receive court approval pursuant to Federal Rule of

Civil Procedure 23(e).  In approving a class action settlement, the district court must find the

settlement to be "fair, reasonable and adequate."  General Motors, 55 F.3d at 785.  Morever, in

cases such as this one, where settlement negotiations preceded class certification and settlement

approval is sought simultaneously with class certification, this Court must be even "more

scrupulous than usual" in its examination of the fairness of the settlement.  Id. at 805; see

Warfarin, 391 F.3d at 534.  "This heightened standard is intended to ensure that class counsel has

engaged in sustained advocacy throughout the course of the proceedings, particularly in settlement

negotiations, and has protected the interests of all class members."  Warfarin, 391 F.3d at 534.

        This Proposed Settlement is, however, entitled to an initial presumption that it is fair

because "(1) the settlement negotiations occurred at arm's length; (2) there was sufficient

discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a

small fraction of the class objected." Warfarin, 391 F.3d at 535 (quoting In re Cendant Corp.

Litig., 264 F.3d 201, 232 n.18 (3d Cir. 2001)).  In Warfarin, the Third Circuit held that despite the

fact that the case involved a settlement-only class, the district court had properly applied the

presumption of fairness after having found that all four factors were met.  Id.

To aid in this Court's determination of fairness with regard to the Proposed Settlement, the

Third Circuit in Girsh v. Jepson, 521 F.2d 153, 157 (3d Cir. 1975), established nine factors for

consideration ("the Girsh factors").  These factors are:

> (1) The complexity, expense, and likely duration of the litigation; (2) the reaction of
> the class to the settlement; (3) the stage of the proceedings and the amount of
> discovery completed; (4) the risks of establishing liability; (5) the risks of establishing
> damages; (6) the risks of maintaining the class action through the trial; (6) the ability
> of the defendants to withstand a greater judgment; (8) the range of reasonableness of
> the settlement fund in the light of the best possible recovery; and (9) the range of
> reasonableness of the settlement fund to a possible recovery in light of all the
> attendant risks of litigation.

Girsch, 521 F.2d at 156-57.   "This nine-factor test requires this Court to conduct both a

'substantive inquiry into the terms of the settlement relative to the likely rewards of litigation' and

a 'procedural inquiry into the negotiation process.'" Prudential I, 962 F. Supp. at 534 (quoting

General Motors, 55 F.3d at 796.)

Settlement of class action litigation has long been favored and encouraged.  See General

Motors, 55 F.3d at 784 ("the law favors settlement, particularly in class actions and other complex

cases where substantial judicial resources can be conserved by avoiding formal litigation"); In re

Sch. Asbestos Litig., 921 F.2d at 1333 (same); Warfarin, 391 F.3d at 535 ("there is an overriding

public interest in settling class action litigation, and it should therefore be encouraged").

For the reasons discussed below, after carefully weighing the Girsh factors, considering

the objections, and mindful of the heightened standard of review in place for a settlement-only class, the Court determines that the Proposed Settlement is indeed fair, reasonable, and adequate and should be approved.

### 1.     Complexity, Expense and Likely Duration of the Litigation

This factor is "intended to capture 'the probable costs, in both time and money, of continued litigation.'" General Motors, 55 F.3d at 811.  The Court must balance the Proposed Settlement against the time and expense of achieving a potentially more favorable result through further litigation.  Where the complexity, expense and likely duration of litigation are significant, the Court will view this factor as weighing in favor of settlement.  Prudential I, 962 F. Supp. at 536.

Prior to settlement, the parties in this case expended significant amounts of money and time on the litigation of these claims.  The Lenahan action has been pending for over four years and, during that time, has gone through extensive discovery[8].  The parties have engaged in discovery motion practice and both sides have reviewed over 18,000 documents produced during discovery.  Approximately twenty five depositions have been taken, including a deposition of Defendants' expert witness.  (Schneider-King Decl. ¶ 15.)  The parties also engaged in substantial motion practice.  Still pending before the Court are two fully briefed motions for summary judgment and Plaintiffs' fully briefed motion for equitable tolling.  If the pending motions for summary judgment did not resolve this case, a lengthy and expensive trial would likely have followed.

---

[8]Similar efforts have been expended in the DeSoto action, which has been pending in California state court since May of 2003.  (Schneider-King Decl. ¶ 23.)

Given the nationwide impact of this litigation, Sears would likely appeal any result reached on liability or damages further prolonging litigation and increasing Plaintiffs' risk of receiving no recovery.    Therefore, even if Plaintiffs were ultimately victorious, the additional delay would not only delay payment, but the additional litigation expense would further reduce any actual recovery.  The Proposed Settlement, however, provides substantial and immediate benefits for the Classes, undiminished by further expenses and without the risk and uncertainty of continued litigation. Therefore, this factor weighs in favor of approving the Proposed Settlement.

**2.**      **The Reaction of the Class to the Settlement**

This factor instructs the Court to look to the reaction of the class to the settlement in determining whether to grant final approval.  See In re Cendant Corp. Litig., 264 F.3d 201, 231-32 (3d Cir. 2001).  Here, the response of the Class to the Proposed Settlement also supports final approval.  Of the 16,252 Technicians to whom notices of the settlement were sent, only 190 class members opted out of the settlement[9].  Additionally, only six objections to the Proposed Settlement were filed with the Court.  This correlates to exclusions amounting to approximately 1.2% of the Class, and objections by less than 0.01% of the Class.  In contrast, over 7,500 Class members responded affirmatively by filing claims for payment.

Overall, the reaction of the Class to the Proposed Settlement has been largely positive. Such acceptance of the Proposed Settlement is persuasive evidence of the fairness and adequacy of the Proposed Settlement.  See Prudential II, 148 F.3d 283, 318 (affirming conclusion that class reaction was favorable where 19,000 policyholders out of 8 million opted out and 300 objected).

_____

[9]Of the 190 class members who opted out, 150 were part of a mass opt out by the *Caiarelli* Plaintiffs and putative *Caiarelli* class members.

23

Objector Winter argues that the reaction of the class does not support the proposed settlement. (Winter Br. 21.)  Winter argues that the absence of any significant number of objections or exclusions is a result of the inadequate notice sent to class members.  As discussed in Part I, § F of this Opinion, the Court finds the notice sent to potential class members to be adequate.   Thus, given the sufficient notice that has been provided to class members, and the relatively small amount of exclusions and objections, this factor weights in favor of the Proposed Settlement.

**3.      The Stage of Proceedings and Amount of Discovery Completed**

This factor requires the Court to examine the level of case development that transpired prior to settlement.  The aim of this factor, therefore, is to ensure that class counsel has an "adequate appreciation of the merits of the case before negotiating" a settlement.  Prudential II, 148 F.3d at 319 (quoting General Motors, 55 F.3d at 813).

Prior to reaching a settlement in this case, the parties engaged in vigorous litigation for over four years.  Also, as discussed above, discovery in this case spanned more than a year, is complete, and has been extensive.  This discovery included significant document production, numerous interrogatories, requests for admissions, and third party subpoenas.  (Schneider-King Decl. ¶¶ 6-11.)  Plaintiffs have taken over thirty depositions and reviewed over 20,000 pages of documents.  In addition to the discovery conducted here Plaintiffs' counsel also engaged in significant discovery in the prosecution of the *DeSoto* matter.  (Schneider-King Decl. ¶ 26.)  In both matters, the parties litigated highly contested discovery motions, as well as motions for summary judgment in the *Lenahan* matter, and the class certification motion in the *DeSoto* action.

Moreover, the parties have gone through several separate rounds of mediation and

settlement negotiations before the Court.  Settlement discussions were held before this Court as well as before Magistrate Judge Bongiovanni.  The parties attended mediation on three separate occasions with retired District Judge Nicholas H. Politan.  These mediation and negotiation processes were rigorous and gave the parties ample opportunity to assess the relative strengths and weaknesses of their claims.  Given the vast amount of discovery obtained, the numerous mediation and negotiation efforts, and the volume of motion practice, the Court is satisfied that class counsel adequately appreciated the merits of the case before negotiating a settlement.

**4.     The Risks of Establishing Liability and Damages**

The fourth and fifth <u>Girsh</u> factors consider the risk of establishing liability at trial in order to balance the parties' relative likelihood of success against the immediate benefits derived from a settlement.  <u>Prudential II</u>, 148 F.3d at 319.  Additionally, these factors "attempt[ ] to measure the expected value of litigating the action rather than settling it at the current time."  <u>In re Cendant</u>, 264 F.3d at 239.  To the extent that establishing damages is contingent upon liability, many of the same risks will be present in each analysis.

Here, Plaintiffs face the initial hurdle of proving Sears' liability under both FLSA and state wage and hour laws.  This is a significant risk in light of the defenses available to Sears, and the fact that generally, normal commuting time is not compensable, even in states with more protective stage wage and hour laws.  (Report of Richard T. Seymour, Expert for Plaintiffs, In Support of The Grant of Final Approval To the Proposed Settlement ("Seymour Report") ¶¶ 53-69.)

Proving that the Technicians' drive times were compensable would be a complex and fact-intensive challenge for Plaintiffs.  One defense Sears asserts is that the HDP program was

completely voluntary.  Plaintiffs' expert asserts that a thorough review of State wage and hour laws and FLSA reveals no significant difference in the compensability of commuting time when employees voluntarily drive an employer's vehicle.  (Seymour Report, ¶ 41(j).)  Plaintiffs deny that the Technicians use of the Sears van was voluntary.  There exists a significant dispute over whether the program was in fact voluntary, and whether the Technicians taking the van home with them at night committed employees to more than *de minimis* work.  Plaintiffs must also refute the defense that the activities they claim are compensable are merely "preliminary" activities and, therefore, non-compensable under the Portal-to-Portal Act, the FLSA, and under state laws following the FLSA.

The general rule, that commuting time is not compensable, can, however, be overcome in certain situations.  Some of these circumstances include showing that: (a) the employer controlled the employee's movements and activities during the commute; (b) the employer required the employee to pick up supplies, or to drop by a customer's location, to give rides to other employees or to perform other functions that could not otherwise be performed during an official workday; (c) the employee's work day actually began before the commute, making the 'commute', in actuality, a move from one work location to another.  (Seymour Report, ¶¶ 62-64.)  Each of these factual distinctions is vigorously disputed in the parties respective motions for summary judgment.  The ultimate outcome of the case is dependent on the determination of a fact-finder on these disputed factual issues.  Consequently, this presents significant litigation risks for both sides.

In addition to defenses to liability, Plaintiffs would have to overcome any defenses regarding damages that Defendants would assert.  Weighing these factors against the immediate

and certain settlement presented to this Court, this Court concludes that the Proposed Settlement is the superior course of action.

**5.**     <u>The Risk of Maintaining the Class Action Through Trial</u>

"[T]he prospects for obtaining certification have a great impact on the range of recovery one can expect to reap from the [class] action, this factor measures the likelihood of obtaining and keeping a class certification if the action were to proceed at trial." <u>Warfarin</u>, 391 F.3d at 537.  As previously stated, this Court's decision to certify this class is for settlement purposes only.

If, however, this Court were to certify this Class for litigation purposes, there is a significant risk of decertification at a later stage in the litigation because of the number and variety of individual questions as to the voluntariness of taking the vehicles home, performance of, and timing of, off-the-clock work, and similar questions.  (Seymour Report ¶ 68.)  This risk of potential decertification does not pose a problem in a settlement class.  <u>Warfarin</u>, 391 F.3d at 537. Therefore, this factor weighs neither in favor, nor against settlement.

**6.**     <u>The Ability of the Defendants to Withstand a Greater Judgment</u>

This factor considers "whether the defendants could withstand a judgment for an amount significantly greater than the [s]ettlement." <u>In re Cendant</u>, 264 F.3d at 240.  The parties do not contend that Defendants could not withstand a larger judgment.  Likewise, there has been no evidence presented to this Court regarding Sears' ability to pay[10].  Thus, this factor does not favor nor disfavor the Proposed Settlement.  <u>See</u> <u>Warfarin</u>, 391 F.3d at 538.

---

[10]*Winter* objectors argue that Sears can withstand a greater judgment than the Proposed Settlement fund.  (Winter Br. 22.)  The *Winter* objectors, however, do not come forward with any evidence of Sears financial viability or the relative impact the Proposed Settlement will have on Sears.

**7.**     **The Range of Reasonableness of the Settlement Fund in Light of the Best Possible Recovery and All the Attendant Risks of Litigation**

The last two <u>Girsh</u> factors ask whether the settlement is reasonable in light of the best possible recovery and the risks the parties would face if the case went to trial.  These factors examine "whether the settlement represents a good value for a weak case or a poor value for a strong case."  <u>Warfarin</u>, 391 F.3d at 538.

Under the Proposed Settlement, Sears will pay $15 million into a Settlement Fund to be used to compensate class members pursuant to a claims procedure.  The payment to members of Class One is weighted in recognition of the favorable wage and hour laws in their states and the pending *DeSoto*, *Caiarelli*, and *Winter* legal actions brought under those laws.  Based upon the level of participation in the settlement by class members, the average payout per claimant in Class One is over $1,606[11].  (RG2 Decl., at Ex. G.)  Additionally, currently employed Technicians nationwide will be able to elect whether to participate in the HDP and will have their duties under the HDP clearly defined.  In light of the attendant risks of litigation discussed more fully above, and the risks involved in continuing this nationwide class action, the settlement is within the range of reasonableness.

Plaintiffs concede that recovery would have been far greater had they succeeded on the merits of their claims.  The *Winter* objectors aptly note that early estimates of nationwide exposure were estimated at $104 million with exposure in Washington alone estimated at $3.5 million.  (Winter Br. 11-12.)  However, [i]t is well-settled law that a cash settlement amounting to

---

[11]The average recovery for Class Two members is over $1,208 and the average recovery for Class Three members is nearly $868.  (RG2 Decl., at Ex. G.)

only a fraction of the potential recovery will not per se render the settlement inadequate or unfair."

Officers for Justice v. Civil Service Comm'n, 688 F.2d 615, 628 (9th Cir. 1982) ("there is no

reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a

thousandth part of a single percent of the potential recovery").  Given the magnitude of the risks

in litigation, the Proposed Settlement represents a fair and adequate recovery.  As discussed

above, this litigation involves difficult legal and factual questions regarding Sears liability under

the FLSA and state wage and hour laws.  Thus, the settlement fund represents a good value for a

case where numerous critical legal issues have not been determined and are therefore uncertain.

This factor, therefore, weighs in favor of settlement.

Given this Court's analysis, the Court concludes that the nine-factor test utilized by the

Third Circuit is satisfied.  The Proposed Settlement is fair, adequate, and reasonable under Federal

Rule of Civil Procedure 23(e).

**D.      Objections to the Settlement**

1.      Objections of the *Winter* Plaintiffs

The *Winter* objectors contend that the Proposed Settlement is not fair, reasonable and

adequate under the Third Circuit's nine-factor analysis.  The *Winter* objectors argue that the

parties have not demonstrated any substantial risk of establishing liability under Washington state

law.  (Winter Br. 13.)  The *Winter* objectors assert that Washington state wage and hour law does

not contain an equivalent to either the federal Portal-to-Portal Act, or the Employee Commuting

Flexibility Act of 1996 ("ECFA"), both of which limited compensability of employee travel time.

(Id.)  Thus, the objectors conclude that, under Washington law, the time spent by Sears

29

Technicians commuting between their homes and customers' residences is compensable[12] and the

Proposed Settlement is, therefore, unreasonable because it provides only a fraction of the recovery

possible.  The parties have recognized that the law of certain states is more favorable to Plaintiffs'

claims and/or damages calculations.  As such, Class One, as comprised of Class members from

such states, receive an additional 50% recovery under the Proposed Settlement.  *Winter* objectors

contend that this surplus recovery is not sufficient to compensate Washington state class members

in consideration of their greater chance of recovery under Washington state law.

In support of their contention, the *Winter* objectors rely on two Washington state trial court

orders granting summary judgment on the drive time issue, and the Washington Department of

Labor and Industries ("DL&I") interpretation of state law.  (Winter Br. 4.)  *Winter* objectors rely

first on an order in <u>Stevens v. Brink's Home Security, Inc.</u>[13], granting plaintiffs' motion for

summary judgment on the drive time issue.  The court stated that with respect to the time

plaintiffs spent driving, in company issued trucks, from their homes to the first job of the day and

from the last job back to their homes constitutes "work time."  (Winter Ex. 3 at 21.)  In making its

determination, the court relied on the definition of "employ" contained in the Washington

Minimum Wage Act.  (<u>Id.</u>)  The trial court issued a similar ruling in <u>Crow v. Transportation, Inc.</u>[14]

granting summary judgment on behalf of the plaintiff class of paratransit van drivers who were

---

[12]The *Caiarelli* objectors make similar contentions, arguing that Pennsylvania law likewise does not contain an equivalent to the Portal-to-Portal Act or the ECFA and that Technicians "drive time" is therefore compensable under Pennsylvania state law.  (Caiarelli Br. 5.)

[13]No. 02-2-32464-9 SEA (King County Superior Court, Sept. 13, 2005).

[14]No. 03-2-35135-1 SEA (King County Superior Court, Dec. 15, 2005).

dispatched directly from their homes in company vans.  (Winter Ex. 9.)

*Winter* objectors also point to the Washington DL&I interpretations of state law which state that, "[t]ime spent driving from home to the job sit, from job site to job site, and from job site to home is considered work time when a vehicle is supplied by an employer for the mutual benefit of the employer and the worker to facilitate progress of the work."  (Winter Ex. 11.)

Currently, there is only one reported Washington appellate case dealing with the issue of travel time.  Anderson v. State of Washington, 63 P.2d 134 (Wash. App.), *rev. denied*, 75 P.3d 968 (Wash. 2003).  In Anderson, a group of correction officers sought compensation for time spent on a state ferry taking them to work at McNeil Island Corrections Center.  The court found that employees were able to engage in personal activities during the ferry passage and that the time spent on the ferry was, in effect, normal commuting time.  The Washington Supreme Court has not ruled on the compensability of travel time.

Based upon what the *Winter* objectors consider to be favorable differences in Washington state law, they argue that the Proposed Settlement does not adequately compensate Washington state class members.  The objectors contend that the parties have not demonstrated a risk of establishing liability under Washington law and, therefore, as to Washington Plaintiffs, the Proposed Settlement is not fair, reasonable and adequate under Girsh.  This Court disagrees.

*Winter* objectors appear to overstate the favorable status of Washington state law and give short shrift to any risks of continued litigation of their claims.  Objectors point only to two, unpublished orders granting summary judgment on the drive time issue, non-binding DL&I guidelines, and one Washington Appellate Court decision.  The Washington State Supreme Court has made no ruling on the issue of the compensability of general commuting time and this Court

is unprepared to make a prediction as to how it would so rule. While the *Winter* objectors would like this Court to predict that it is so likely that the Washington State Supreme Court would rule in their favor that the Proposed Settlement is unfair, the record before this Court demonstrates quite the contrary.

It is generally recognized that mere commuting time is not compensable, even in states like California and Washington with generally more protective state labor laws. See Anderson, 63 P.2d 134 (travel time to and from work generally non-compensable under Washington state law). The summary judgment orders relied on by objectors do not advance their position. In Brinks, the courts determination that plaintiffs' "drive time" was compensable seemed largely based on the perceived harshness of Brink's policies. The court based its decision, in part, on its finding that "Brink's places significant restrictions on the technicians' activities and uses of the trucks during this 'drive time.'" (Winter Ex. 3.) During this litigation, Sears has contended that the HDP was voluntary and contained minimal restrictions on the Technicians' use of the vehicles during the commute periods. Such factual distinctions greatly affect the relative strength of Washington claims and are overlooked by the *Winter* objectors.

There is little about Washington state law at this time that enables this Court to conclude that the Washington Class claims are so much stronger than the rest of the Class sufficient to justify even the modest bump in recovery that they receive under the Proposed Settlement. Under current Washington law, similar to that of other state laws included in the Proposed Settlement, there is no statutory or regulatory provision or controlling case law precedent establishing the Technicians' rights to be paid for their commute time under the HDP. Therefore, there is no less risk for Washington plaintiffs in establishing Sears' liability under Washington state law, than

32

there exists for the rest of the Class.  Moreover, the *Winter* objectors minimize the risks of

continued litigation.  The Proposed Settlement before this Court was negotiated by parties who

litigated these claims for over four years and were fully informed of the relative strengths and

weaknesses of their claims.   Additionally, to the extent *Winter* objectors find the Proposed

Settlement to be unacceptable in light of their expectations, they had the option to opt-out of the

Class and pursue their claims in Washington State Court individually.

       2.    <u>Pennsylvania Objectors</u>

Pennsylvania objectors make contentions similar to those of the *Winter* objectors. The

objectors argue that the Proposed Settlement provides Pennsylvania class members with

inadequate compensation in light of the reduced level of risk faced by putative class members

under Pennsylvania law.  (Pennsylvania Br. 3.)  Pennsylvania objectors base their contention

largely on three facts: (1) that Pennsylvania, like Washington, has not adopted an analog to the

Portal-to-Portal Act,  (2) that under Pennsylvania's Wage Payment and Collection Law[15]

("WPCL") Technicians can recover wages for all work performed and broadly defines "wages",

and (3) that Pennsylvania's Minimum Wage Act ("MWA") provides for the recovery of straight

time and overtime wages earned but not paid.

The Court is not persuaded that claims under Pennsylvania law are so significantly

stronger than the class claims that, as to them, the Proposed Settlement is inadequate and unfair.

Pennsylvania class members face substantial risk in seeking relief under Pennsylvania law.  As

---

[15]In the Pennsylvania case, the trial court dismissed the WPCL claims on preliminary
objections, holding that the Pennsylvania plaintiffs did not establish a contractual right to
compensation since they were at-will employees and not employed pursuant to a contract of
employment.

recounted by Plaintiffs' expert, regulations implementing Pennsylvania's wage and hour law

contain two express limitations on compensable travel time: (1) only travel time that is "part of

the duties of the employee" is compensable, and (2) only travel time "during normal working

hours" is compensable.  (Seymour Report ¶ 109.)  A court may interpret the regulations to mean

that some travel time is not compensable, that the mere fact the employee is traveling is not

enough to make it part of their normal duties, and that the fact that the employee is traveling at a

certain time is not enough to make that time part of "normal working hours."  (Id.)

The Court is satisfied that neither the *Winter* nor the Pennsylvania objectors have provided

a sufficient basis for this Court to refrain from approving the settlement.

### III.   CLASS COUNSEL'S APPLICATION FOR ATTORNEYS' FEES AND EXPENSES

Also before the Court is Plaintiffs' request for an award of attorneys' fees amounting to

30% of the Settlement Fund, and reimbursement of costs and expenses in connection with the

final resolution of this litigation in the amount of $281,759.11.  Plaintiffs' request is unopposed

and, for the reasons stated below, the Court will grant the application for attorneys' fees and

expenses.

### A.   Attorneys' Fees

The Third Circuit has established two methods for evaluating the award of attorneys' fees:

(1) the lodestar approach, and (2) the percentage of the recovery approach.  General Motors, 55

F.3d at 820-21; Prudential II, 148 F.3d at 333.  The Third Circuit has emphasized that "[t]he

percentage of recovery method is generally favored in common fund cases because it allows

courts to award fees from the fund 'in a manner that rewards counsel for success and penalizes it

for failure.'"  In re Rite Aid Corp. Sec. Litig., 396 F.3d 294, 300 (3d Cir. 2005) (quoting Prudential

II, 148 F.3d at 333).  This Court finds that the percentage of fund method is the proper method for compensating Plaintiffs' counsel in this common fund case.

In Gunter v. Ridgewood Energy Corp., 223 F.3d 190, 195 (3d Cir. 2000), the Third Circuit set forth with specificity the factors that a court should consider in evaluating such requested attorneys' fees.  The Gunter factors include:

> (1) the size of the fund created and the number of persons benefitted; (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel; (3) the skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6) the amount of time devoted to the case by plaintiffs' counsel; and (7) the awards in similar cases.

Gunter, 223 F.3d at 195 n.1.  In Gunter, the Circuit also instructed that a District Court should "cross-check the percentage award at which [it] arrive[s] against the 'lodestar' award method, which is nomrally employed in statutory fee-award cases."  Id.

1.    The Size and Nature of the Fund Created and the Number of Class Members Benefitted by the Settlement

The Class here is comprised of approximately 16,000 persons who will share in a cash settlement fund of $15 million, less attorneys' fees, expenses and incentive awards as granted by this Court.  The settlement amount is significant, especially in view of the risks and obstacles to recovery presented in this case.

2.    The Absence of Objections

Following preliminary approval of the Settlement, more than 16,000 notices of the Proposed Settlement and the fee and expense request were mailed to potential Class members at their last known address.  (Cert. Of Claims Administrator Kathy Y. Dales ("Dales Cert."), ¶ 5.)

Class Counsel received no objections from the Class on the issue of the proposed fee[16]. (Id.)  As discussed above, only 6 Class members objected to the Proposed Settlement as a whole.  The lack of significant objections from the Class supports the reasonableness of the fee request.  See In re Lucent Tech. Inc. Sec. Litig., 327 F. Supp. 2d 435, 431 (D.N.J. 2004); Stoetzner v. United States Steel Corp., 897 F.2d 115, 11-19 (3d Cir. 1990) (where 20 members of a 281 person class objected, the court found the response of the class as a whole "strongly favors [the] settlement").

       3.      The Skill and Efficiency of Plaintiffs' Counsel

The skill and efficiency of the attorneys involved is "measured by the quality of the result achieved, the difficulties faced, the speed and efficiency of the recovery, the standing, experience and expertise of the counsel, the skill and professionalism with which counsel prosecuted the case and the performance and quality of opposing counsel."  In re Ikon Office Solutions, Inc. Sec. Litig., 194 F.R.D. 16, 194 (E.D.Pa. 2000).  Here, Plaintiffs' counsel  includes attorneys with significant employment law and class action experience.  Class Counsel, as well as counsel for Sears,  also includes firms with extensive experience in employment and labor law.  The settlement entered with Defendant is a reflection of Class Counsel's skill and experience.  See In re Warfarin Sodium Antitrust Litig., 212 F.R.D. 231, 261 (D. Del.2002) (class counsel "showed their effectiveness through the favorable cash settlement they were able to obtain").

       4.      Complexity and Duration of the Litigation

As discussed above, this case involved many complex factual and legal issues.  Plaintiffs' counsel have litigated this case for over four years.  This included deposing numerous Sears'

---

[16]As discussed above, six Class members have objected to the Proposed Settlement generally.

employees concerning the HDP, reviewing approximately 28,000 pages of documents, briefing a motion for summary judgment, answering written discovery and propounding written discovery, engaging in discovery disputes, conducting research of complex state wage and hour laws and the FLSA, and engaging in multiple rounds of mediation.

Settlement negotiations in this case were also complex.  The parties needed to craft a settlement that would take into account substantive and procedural differences in the wage and hour laws of each of the fifty states. (Joint Decl. ¶¶ 15, 17.)  The Court is familiar with the long and arduous settlement process that led to the present Proposed Settlement.  The complexity of the issues involved in the prosecution of this litigation support the requested fee.

5.      The Risk of Nonpayment

The risk of nonpayment in complex cases such as this one is "very real and is heightened when Plaintiffs' Counsel press to achieve the very best result for their clients." In re AremisSoft, 201 F.R.D. at 134.  Sears had numerous defenses in this litigation which posed substantial risks to findings of liability and damages.  (Joint Decl. ¶ 76.)  These defenses included: the alleged voluntary nature of HDP; factual issues surrounding what it requires of Technicians and how much time Technicians spent performing tasks under HDP; the general recognition that normal commuting time is not compensable; and the *de minimis* doctrine, under which Sears could significantly reduce damages.  (Id.)  Plaintiffs' expert, Richard Seymour, analyzed the fairness of the Proposed Settlement and stated that, "[t[his is not a case that presented a prospect of certain victory for plaintiffs . . . In my judgment, plaintiffs faced a substantial risk of losing this case on the merits."  (Seymour Dec. ¶ 55.)

Similarly, at the time of the Proposed Settlement, cross motions for summary judgment

were pending in *Lenahan*, and the parties in *DeSoto* were likely to bring similar motions.  (Joint

Decl. ¶ 89.)  In light of the defenses and arguments asserted by Defendants, Plaintiffs faced a risk

of this Court ruling against them on their motions.   Even if Plaintiffs were successful on their

motions, Plaintiffs still faced significant risks at trial. Accordingly, the risk of non-payment

weighs in favor of approving the fee request.

> 6.      The Time Devoted to this Case by Plaintiffs' Counsel

Class Counsel has expended nearly 12,695.74 hours working on this case since the

inception of the litigation four years ago. Additionally, as discussed above, Class Counsel has

spent substantial amounts of time reviewing voluminous discovery materials, briefing substantive

motions before the Court, and has spent tremendous efforts at negotiating and arriving at the

Proposed Settlement.  The amount of time and effort Class Counsel spent on this litigation

supports the fee request.

> 7.      Awards in Similar Cases

The seventh and final Gunter factor involves a comparison of the fee request with

attorneys' fees awarded in similar cases.  Attorneys' fees of 30 percent are common in this

Circuit.  See In re Rite Aid Corp. Sec. Litig., 55 F.3d 768, 822 (3d Cir. 1995) (review of 289

settlements demonstrates "average attorney's fee percentage [of] 31.71%" with a median value

that "turns out to be one-third"); General Motors, 55 F.3d at 822.

Likewise, attorneys' fees of approximately 30 percent of the common fund are also

regularly awarded in labor and employment class actions.  See In re Safety Components, Inc. Sec.

Litig., 166 F Supp. 2d 72, 102 (D.N.J. 2001) (granting award of 33 1/3 % in common fund case

and citing to ten cases from this Circuit holding the same); see also Erie County Retirees Assoc. v.

38

County of Erie, Pennsylvania, 192 F. Supp. 2d 369, 382-83 (W.D. Pa. 2002) (38% of common fund was awarded in ADEA case).  The percentage requested in the Application for Attorneys' Fees in this matter appears to be reasonable when compared to fee awards in other cases.

      8.     Lodestar Cross-Check

The Third Circuit has suggested it is sensible for a court to use a second method to cross-check its initial fee calculation. See In re Rite Aid, 396 F.3d at 300.  However, the "lodestar cross-check does not trump the primary reliance on the percentage of common fund method."  Id.; see Cendant, 264 F.3d at 285 ("The lodestar cross-check, however, is very time consuming.  Thus, while the Court should in the first instance test the presumption, if challenged, by the *Gunter* factors, it may, if necessary, utilize the lodestar cross-check.").  To apply the lodestar method, the Court must examine the number of hours Class Counsel worked and the rate for these lawyers' services, and multiply the number of hours worked by the hourly rate.  The Court can also multiply the hourly rate by a lodestar multiplier to reflect the risks of nonpayment facing counsel. Prudential II, 148 F.3d at 340-41.

Here, according to their submissions, Class Counsel spent 12,695.74 hours on the litigation, and had an average mixed hourly rate of $353.63.  (Joint Br. App. Ex. 1.)  This results in a lodestar of approximately $4,489,580.20.  See  In Re Cendant Corporation Prides Litig., 243 F.3d 722 (3d Cir. 2001).  Given the fee Class Counsel has requested, the multiplier under the Cendant Prides formula is 1[17].

In Cendant Prides, the Third Circuit ruled that a multiplier of 3 was an appropriate ceiling.

---

      [17]Class Counsel has requested 30% of the Settlement Fund.  This amounts to approximately $4,500,000.  Calculating the lodestar multiplier:  12,695.74 hours x $353.63 = $4,489,580.20. $4,500,000 divided by $4,489,580.20 = 1.002.

243 F.3d at 742.  In <u>Prudential</u>, the Third Circuit noted, based on a review of common fund cases, "[m]ultipliers ranging from one to four are frequently awarded in common fund cases, when the lodestar method is applied."  <u>Prudential II</u>, 148 F.3d at 341.  Accordingly, the Court concludes that the requested fee of 30 percent is reasonable when measured by the lodestar cross-check.

**B.      Counsel's Costs and Expenses**

In addition to their request for attorneys' fees, Class Counsel seeks reimbursement of costs and expenses in the amount of $281,759.11.   In common fund cases, counsel is "entitled to reimbursement of expenses that were adequately documented and reasonably and appropriately incurred in the prosecution of the case."  <u>Cendant</u>, 232 F. Supp. 2d at 343.  Upon review of the affidavits submitted in support of this request, the Court finds the requested amount to be fair and reasonable.  Class Counsel's expenses reflect costs reasonably incurred in computerized legal research services, travel costs, experts' and mediators' fees and copying costs. (App. Exs.  2-7.) Additionally, throughout this litigation, Plaintiffs' counsel has advanced the cost of all expenses necessary to prosecution of this case.  (Joint Decl. ¶ 85-87.)   Courts in this Circuit have found these types of expenses to be reasonable.  <u>See Oh v. AT & T Corp.</u>, 225 F.R.D. 142, 154 (D.N.J. 2004) (finding expenses such as "(1) travel and lodging, (2) local meetings and transportation, (3) depositions, (4) photocopies, (5) messengers and express service, (6) telephone and fax, (7) Lexis/Westlaw legal research, (8) filing, court and witness fees, (9) overtime and temp work, (10) postage, (11) the cost of hiring a mediator, and (12) NJ Client Protection Fund pro hac vice." to be reasonable).  This Court is satisfied that the instant request for expenses is reasonable and will, therefore, grant Class Counsel's request for costs and expenses.

40

**C.**   **Defendants' Request for Prospective Relief**

In addition to the injunctive relief requiring Sears to alter its HDP, section B.7 of the

Proposed Settlement sets forth that Sears would request, and Plaintiffs would not oppose, a

determination by this Court that Sears' HDP is compliant with federal wage and hour laws.   In

accordance with this provision of the agreement, the proposed Final Order approving the

settlement includes the following language:

> 12.   This Court, having been fully briefed on the material facts . . . finds and
> determines. . . as follows:
>
> (a)      The participation by In-Home Service Technicians in Sear's HDP . . . is
> subject to an agreement on the part of the employer and employee within the
> meaning of Section 4(a) of the Portal to Poral Act of 1947 . . . .
>
> (b)      The In-Home Service Technicians, who participate in the HDP, use their Sears
> provided service van for commuting . . . within the meaning of the ECFA.
> This commute . . . is time spent traveling to and from the actual place of
> performance of the principal activity for which the Technician is employed to
> perform . . . within the meaning of Section 4(a)(1) of the Portal to Portal Act,
> . . . and is therefore non-compensable.  Likewise, the Technicians' commute
> constitutes non-compensable ordinary travel between home and work, as well
> as "preliminary" and/or "postliminary" activity within the meaning of the
> Portal to Portal Act.
>
> (c)      The activities In-Home Service Technicians are instructed to perform pursuant
> to the HDP prior to the start of their route and the commencement of their
> compensable work day or after the end of their route . . . are activities which
> are incidental to the use of a Company provided vehicle for commuting within
> the meaning of the ECFA, and are not part of the Technicians' principal
> activities within the meaning of Section 4(a)(2) of the Portal to Portal Act. .
> . and, therefore, are not compensable.  These incidental activities are also non-
> compensable  "preliminary"  and/or  "postliminary"  activities  within  the
> meaning of the Portal to Portal Act.

(Proposed Form of Order, ¶ 12 (a)-(c) ("Order").)   In essence, Section B.7 of the Proposed

Settlement, and the accompanying portion of the proposed Final Order, asks this Court for an

imprimatur of legality on Sears' HDP under federal wage and hour laws.

Sears contends that this Court has been sufficiently briefed, via the pending summary judgment motions, on the issue of Sears' HDP and its compliance with federal wage and hour laws.  This Court disagrees.  The HDP  has changed since the filing of this lawsuit and is altered in significant ways by the terms of the Proposed Settlement.  The implementation of the Proposed Settlement, and these changes, will be nationwide and affect Sears' HDP program in every state.  The briefing before this Court, however, was limited to the facts and circumstances of the *Lenahan* Plaintiffs and the HDP as it existed at that time.  Importantly, the program that Defendants ask this Court to declare compliant has yet to be put into practice.

Furthermore, Defendants' request appears to offend the well-settled prohibition on advisory opinions.  The power given to federal courts under Article III of the Constitution is not absolute.  At the core of Article III's limitation on federal judicial power is the ban on advisory opinions.  E. Chemerinsky, FEDERAL JURISDICTION at 47 (Little Brown, 1994).  The ban on advisory opinions is the oldest and most consistent justiciability doctrine.    In order for a case to be justiciable, and not an advisory opinion, an action must present "(1) a legal controversy that is real and not hypothetical, (2) a legal controversy that affects an individual in a concrete manner so as to provide the factual predicate for reasoned adjudication, and (3) a legal controversy so as to sharpen the issues for judicial resolution."  Rhone-Poulenc Surfactants and Specialties, L.P. v. C.I.R., 249 F.3d 175, 182 (3d Cir. 2001).  These requirements assure that cases presented to the court are concrete legal disputes between genuine adversaries.

The declaration Defendants request is speculative, and not the subject of a live dispute.  There has been no true adversarial process regarding this declaration because the Plaintiff class,

although not endorsing the declaration, has agreed not to oppose it.  Defendants ask this Court, in

a vacuum, to make a declaration with regard to a program that has yet to be implemented.   At the

final approval hearing, statements by counsel implicitly acknowledged the advisory nature of this

request.  In response to the Court's reservations about the language of the order, counsel stated

that, "what we're asking is in the full disposition of this case, recognizing that part of what is

necessary for putting this matter to rest is some guidance for Sears as to how it can perform its

program in the future." (Tr. 16:6-10.)   The Court does not have the authority to render such

guidance and will not make a determination of legality on a program that has not yet been

implemented. Therefore, in light of the prohibition on advisory opinions discussed above, the

declaration Defendants seek is not available from this Court.


## IV.   CONCLUSION

For the foregoing reasons, this Court will, (a) GRANT Plaintiffs' motion for final approval

of the Proposed Settlement, and (b) GRANT the motion of Class Counsel for attorneys' fees of 30

% of the Settlement Fund (minus the $300,00 hold back pursuant to the Settlement Agreement)

and  $281,759.11 in costs and expenses.  An appropriate form of order will follow.


        s/ Stanley R. Chesler
Stanley R. Chesler, U.S.D.J.